23-11196, Sanders v. Gibson, and we'll hear from Ms. Courser. Thank you, Judge Haynes, and may it please the Court. The easiest way to resolve this appeal is to address the injunctive claims and the damages claims separately. With respect to the injunctive claims, the Court should remand to allow the District Court to consider in the first instance whether those claims are now moot in light of TBCJ's new policies. And with respect to the damages claims, the Court should reverse because they're barred by qualified immunity. Because this Court only needs to address the damages claims, I'd like to spend my time there. Qualified immunity's clearly established prong isn't met. I just want to be clear, y'all agree that even assuming arguendo that we find qualified immunity on the individual basis, on the official capacity, if there is, if there could be jurisdiction, I know that you're claiming there's some issue there, but there could be jurisdiction for, um, the other things, the injunctive relief and the other things besides the money. Uh, to clarify the issues that are currently before the Court, the District Court dismissed the damages claims in official capacity on sovereign immunity? No, it didn't on the, um, injunctive relief. Not on the injunctive relief. Right. So that's what I'm saying. You're not disputing that at that level. Correct. Okay. And so that would need to go back to the District Court to consider potential mootness in light of TBCJ's new policies. And so really the only thing that this Court needs to address is the damages claims and qualified immunity is the clearest path to resolving that. And that's for two reasons. With respect to the adequacy of process argument, the Supreme Court held in Hewitt that only an informal non-adversarial hearing is required and the Court specifically held that the right to present witness statements and documentary evidence was not required by due process. Here Mr. Sanders is afforded not only the right to attend these hearings, but to provide any witness statements or any documentary evidence that he would like to, like for the committee to consider. Nevertheless, Mr. Sanders raises four procedural arguments and I'd like to address each of those in turn. The first is his argument that he doesn't get to appear before the final decision maker and that's contradicted by his own exhibits. The decision forms all show that all three panel members signed off on the decision to remain Mr. Sanders in restrictive housing. An example of one of those forms is at page 565 of the record. And the forms reflect the reality that the decision is a two-thirds majority vote of the three panel members. So Mr. Sanders does in fact get to appear before the final decision maker. His next argument is that he isn't a current escape risk. Two points of reference for this analysis, Your Honors. At first, it does violate the presumption of good faith, and second, his allegation that the hearing is what he terms a sham is a legal conclusion, not a factual allegation. But more to the heart, the argument is an objection to the merits of the committee's decision, not to the procedures that Mr. Sanders was afforded. Mr. Sanders admits that the panel considered his disciplinary record because he introduced as exhibits the decision forms showing that the panel considered his disciplinary record because they— Okay, but what I'm trying to understand is what has he done in the ensuing, now it's more than nine years, but in the ensuing years since he tried to escape that would make it necessary to keep him in administrative segregation? Your Honor, Mr. Sanders doesn't clarify that in the record. He does admit he's had at least one major disciplinary violation during that time. And more to the point, the committee's decision is based on whether he is still an escape risk. For example, the Third Circuit held in Shotes, which is an opinion that Mr. Sanders relies heavily on for his liberty interest argument, that a past escape attempt can still be evidence that a prisoner is an escape risk even eight years later to the extent that it provides predictive value about the inmate's future behavior. Here, Mr. Sanders admits on page 649 of the record that his original escape attempt was by means of a saw to the extent that the committee deems the fact that he obtained a saw before predictive of whether he might obtain one in the future. That is certainly a consideration that the committee might take into account. But y'all have let his cellmate out that was also going to escape with him, Cook, I think was the name. That's correct, Your Honor. So how does that make sense? That's the only point of evidence that Mr. Sanders has provided in support of his allegation that he isn't an escape risk. And as the committee informed him at multiple hearings, those are different cases. We don't have Mr. Cook's disciplinary record in the record here, Your Honor. And I would point the court to the Court of Appeals opinion in one of Mr. Sanders' underlying criminal cases in which the Court of Appeals noted that by that point, Mr. Sanders had already attempted to escape three times. The citation for that opinion is 2008 Westlaw 4445644. That would make this Mr. Sanders' at least fourth attempt to escape from prison. And we know nothing about whether his cellmate has attempted to escape from prison before. And so they just aren't proper analogies here because that information isn't in the record. Aren't we here on the denial of a motion to dismiss? Aren't these issues better addressed on a summary judgment motion on qualified immunity? No, Your Honor. And the reason for that is that the defects in the pleadings are incurable because Mr. Sanders hasn't pointed to clearly established law showing procedural violations. Although the Supreme Court has been clear that the committee has to consider whether inmate is a current risk, the Supreme Court has expressly declined to require anything more specific than that. And Mr. Sanders hasn't pointed to any binding case law that can be considered for purposes of qualified immunity, showing that he is entitled to more process than what he received at the hearings. Again, his objections seem to be to the merits of the committee's determination, not procedures that he was afforded at these hearings. His next argument, I think, really is an extension of that, and that is that— Well, our case law is that qualified immunity should be given early, not late, if it's available. And obviously, it's not always. So what is your best argument on the notion that it wasn't clearly established, even if we're finding for the other side the rest of the merits? Your Honor, I think I would point to the briefing and the lack of clearly established law that's pointed to there. I think that the easiest cases with the liberty interest, the only two binding numbers we have as far as duration, we know from Standen that 30 days is not long enough to establish a liberty interest, and we know that 39 years is too long. We have no precedential numbers for purposes of clearly established law within that range. And so Mr. Sanders, on that point alone, hasn't borne his burden. And I would point out to the Court that there have been two published opinions from this Court since then. Those cases are LaVernge from this Court that held that five years was not enough under substantially similar circumstances, and the other case was Carmouche, which rejected any sort of notion that there's a two-and-a-half-year threshold. Those cases both post-date the facts of this case, and so they can't be used for purposes of clearly established law, but, of course, they are relevant to the Court's analysis of whether there has been a constitutional violation. I'm just wondering, too, I mean, even if, generally speaking, administrative segregation was appropriate, is there some methodology by which y'all can make it a little bit less crazy than he's saying it is, making sure he gets showers, making sure he gets to work out, et cetera, et cetera? Because that is part of the problem that he's having, is he says it's kind of really just cubby sitting there, and that would be very difficult, even though I understand he's a criminal and he needs to be punished. I'm not disputing that at all, but it does seem like our world of America doesn't, you know, have terrorism for people that are in prison. I'd have two responses to that, Your Honor. The first is that TDCJ recently changed its procedures for its hearings, as noted in my letter to the Court about potential mutinous issues, and so this is an issue that TDCJ is addressing, but more to the point, I think that that argument confuses the analysis for the conditions that are required to give rise to a liberty interest. This Court explained in Harper that the conditions of confinement have to arise from classification status in order to give rise to an interest in that status, and the Court there said that sewage in the inmate's cell and extended sleep deprivation caused by noisy inmates were not conditions that related to the inmate's classification status, and so they weren't relevant to a due process claim. The Court did say that they stated a claim for an Eighth Amendment violation, just that they weren't relevant to the due process analysis, and I would note to the Court that although the District Court dismissed the Eighth Amendment claims for improper joinder, it allowed Mr. Sanders to refile. He has since refiled those claims as part of another lawsuit, and that's currently being litigated in the District Court, so Mr. Sanders does have an avenue to pursue those issues, Your Honor. This case simply isn't it because it isn't relevant to the due process analysis. What is relevant to the due process analysis? The Court, the conditions that directly arise from his classification status that this Court typically looks to typically center around the amount of time that an inmate spends in his cell, the amount of visitation that he has, whether he has opportunity to interact with other inmates, and those are things that are fairly consistent across most of the cases that this Court has examined, and so here the dispositive factor is duration, and again, Your Honor, the only two clearly established numbers that we have are that 30 days is not enough and 39 years are too long, and so for that reason, Mr. Sanders hasn't met his burden. I saw y'all's letter. Can you explain it a little more? I can't say I totally understood the letter y'all just sent us. Of course, Your Honor. TDCJ updated its hearing policies in September to transfer responsibility for conducting these hearings from the State Classification Committee to a newly created body called the Multidisciplinary Treatment Team. That Multidisciplinary Treatment Team has new members, and so we would propose that the District Court can determine whether any of that impacts the injunctive claims moving forward. So you're saying they might have a different way of addressing him? That's correct, and there are different decision makers as well. Okay, and when are they next going to hear him? Mr. Sanders' most recent hearing was in October. He's due for his next one in April. Okay. Before my time expires, Your Honor, I do want to address his bias in decision form arguments. With respect to bias, as a preliminary matter, Mr. Sanders has concluded that his decision makers are biased without providing any facts to support that and in violation of the presumption of good faith. But more to the point, Mr. Sanders hasn't pled causation. There were 13 individuals on the five hearing panels about which Mr. Sanders complains. He's only alleged that four of them were biased. The other nine members, whose character isn't in question here, also voted to remain Mr. Sanders in restrictive housing, and with respect to his decision form argument, the Supreme Court held in Wilkinson that a short statement of the reasons was all that's required, and the Court expressly declined to require more. And for that reason alone, Mr. Sanders hasn't shown a clearly established violation of law. I'm not aware of any case law that addresses the amount of detail that has to be included in that short statement. And along those same lines, there's also no requirement that the statement be written as opposed to verbal. In this Court's decision in Hope, both the majority and the dissent agreed that Mr. Hope had notice of the reasons for his classification, but yes, he had been told that the reason for his classification was that he's an escape attempt, or he's an escape risk, rather. And Mr. Sanders' exhibits show that he knows at least some of the information that the panel considered. The decision forms state that the reason is that he's an escape risk. The decision forms also show that he has disciplinary violations, some of which Mr. Sanders admits were major. And on page 649 of the record, he states that he, quote, knows to a major degree the decision is based at least in part on things his cellmate told prison officials about him. So Mr. Sanders is clearly on notice of the reasons for his classification status. This Court has no further questions at the moment, and then I'd be happy to address any others on rebuttal. All right. Thank you. We'll hear from Stephen Marcus. May it please the Court, Stephen Marcus on behalf of appellee James Sanders. I'll start where my friend started. We agree that a remand on injunctive relief makes sense here, and that the question before this Court is a question of damages and the question of qualified immunity. To start with Mr. Sanders' liberty interest, as my friend agrees, there are two components, the duration of his term in solitary confinement and the conditions that he experiences there. As to duration, Mr. Sanders has been in solitary confinement for more than a decade now, and critically, his detention there is indefinite. So unlike many prison systems that send prisoners to solitary confinement for 30 days for violating a prison rule, or 60 days, Mr. Sanders has been sent to solitary confinement. What do you do about the fact that he has tried to escape and he has committed disciplinary issues, and so that's causing himself a problem, which is how this kind of thing works. So what's your response to that? Sure. So the only evidence in the record here is that Mr. Sanders was sanctioned in 2014 for what, as best I can tell, was possession of hazardous tools. I believe he alleges it was possession of a saw. He shared a cell at that time with Keith Cook, who, as Your Honor noted, was also sent to solitary confinement. Mr. Cook was released from solitary confinement several years ago. I believe the allegation and the complaint was on the order of several years ago. The other key information in the record is that Mr. Sanders alleges that he's had no disciplinary infractions while he's been in solitary confinement that relates to an escape attempt at all. Again, the purpose of sending him to solitary confinement isn't punitive, it's prison management, and so it's TDCJ that has to determine whether Mr. Sanders remains an escape risk, and the crucial piece of evidence that you would look to would be whether he's engaged in any conduct while in solitary confinement that demonstrate that he remains an escape risk. Go ahead, please. We keep hearing about evidence in the record and pieces of evidence, but again, aren't we here on a denial of a motion to dismiss? Aren't we limited at looking solely at the allegations and the complaint? That's exactly right, Your Honor. We are here on a motion to dismiss. The allegations and the complaint must be taken as true. I'll note that there was a discussion about— Well, it's a little different animal when we're talking about qualified immunity. The burden goes on you once they bring it up. I completely agree. As to the contents of the record, there was a dispute in the briefs about whether the court has to only look at the pages that were designated the complaint or whether it has to look at the exhibits that Mr. Sanders submitted along with his complaint. We cited in our brief Howard v. King from this court in 1983, which actually reversed a district court for failing to consider materials in a motion for a preliminary injunction that were submitted after a complaint was filed. The court in Howard held that the district court must look beyond the inmate's formal complaint to consider as amendments to the complaint those materials subsequently filed. In that case, those materials were a motion for a preliminary injunction, the allegations in the motion itself, as well as exhibits that were attached to the preliminary injunction. That's exactly what our dispute here is, although I'll note that if this court looks just at the record that everyone agrees is properly before the court, it's more than sufficient for Mr. Sanders to have made out his liberty interest. Well, that's what I want to ask about. Even if you get through Part I, it has to be clearly established person by person that is sued, okay? Not just in general, but person by person when we're talking about the individual, not necessarily the official. So please explain what case law you have that shows that this is clearly established that what they're doing is wrong person by person. On the liberty interest, the best case for clearly established is Wilkerson from this court in 2014. Wilkerson relied on a 2005 Supreme Court case called Wilkinson, which we've agreed to call Austin to avoid confusion. It's Wilkerson that clearly established that an indefinite placement in solitary confinement under conditions that look very similar to the conditions here violates a due process or, sorry, creates a due process interest that triggers a right to a hearing. The allegations in Wilkerson were that the prisoner there was sent to solitary confinement for an indefinite period of time, just like here, and that the prisoner experienced 23 hours a day in cell isolation with limited exercise and limited contact. Okay, and specifically, Gibson, Reitsma, Davis, Vitolo, and Bartholin. So those five defendants were all defendants that were, that are officers that attended Mr. Sanders' hearings. There's a dispute about whether they have any actual authority to release Mr. Sanders to general population. That's one of our allegations that Mr. Sanders made. But as far as why those five defendants were named, they're all defendants who purport to be on the state classification committee. They show up at these hearings. Well, given that they've just changed that, does that make them moot? That could be an argument that they might raise on remand as to injunctive relief. I think the answer is no, but that issue isn't properly before the court here. As to qualified immunity, there are five officers who have, who attend the SCC hearings and who remand Mr. Sanders to solitary confinement at every hearing. So they are properly named. Gibson is the vice. But if they are concluding from the hearings that he is a problem and does need to still be where he is, is that, is that something that's wrong? Is that bad? I mean, is that something that doesn't deserve qualified immunity? I'll take that in two ways. First, I think the central allegation is that they're not the actual decision makers. As Mr. Sanders pleads in his complaint, when he attends these hearings, the decision makers, the officers that are at the hearings say, I don't have the authority to release you. I have to- But all the more, why are they not qualified immunity? Well, they, as Mr. Sanders has alleged, they are the officers that, that are depriving him of due process because they're the only officers that show up to his hearings. Mr. Sanders has alleged that there are decision makers in, I think, in Huntsville, which is where the TDCJ headquarters is located, that review his file. He doesn't know who they are. He's never given an opportunity to persuade them. And it's, it's those officials who he's asking to have a hearing in front of, but he's never told who they are, and he's never given an opportunity to persuade them. That's a violation of clearly established law, and the key place to look there is Hewitt. In Hewitt, the Supreme Court held that due process requires an opportunity to present your views to the prison official charged with deciding whether to transfer you. Mr. Sanders is entitled to an opportunity to present his views to the prison official charged with deciding whether to transfer him. That's clearly established law. And so, providing hearings where three officers show up, but where they don't have the ability to actually grant the relief requested, violates clearly established law. I'll also note that the five defendants that Mr. Sanders has sued. Five of them? Because, I mean, the problem is, if you work for a prison, and you're told to go to X and you go to X, but you can't do anything more than you did, why is that something that you should be sued for? Let, let me understand the question. If the, I understand. The, and let me, let me try to take it in another way. The five defendants are also liable because they're responsible for the conditions that Mr. Sanders experiences. Ratesima himself is the assistant warden who's in charge of the solitary confinement unit. Judge Haynes, as I noted from my, your colloquy with my friend, the conditions in the unit really are extreme, as he's alleged. As Mr. Sanders has alleged in this case, he talks about how he spends almost 24 hours a day in his cell at all times. He has very limited human contact. And it's appropriate in cases to sue the warden who has custody over you and who's responsible for creating the unconstitutional conditions that you live in. And so, Officer Ratesima is the warden of the administrative segregation unit who's responsible for those conditions. And he doesn't think it's positive not to have to deal with other criminals? Can you repeat that, Your Honor? Well, he's upset that he doesn't get to interact with the other criminals in the prison. I'm just wondering why does he want to? I understand he wants to take a shower and all of that, I get that, but why does he want to interact with the other criminals? I think what looms largest for Mr. Sanders is the opportunity to have contact visits with his family members. That was, if you look at the cases that my friend has cited on the other side, Laverne and in Wilkerson itself, the prisoners there had an opportunity to have contact visits. Nonetheless, in Wilkerson, the court found that there was a liberty interest that was  In Laverne, the court found no liberty interest. We think that case is distinguishable on duration alone. The prisoner there spent less than five years in solitary confinement, and it was a definite term, not an indefinite term in solitary confinement. But the prisoner in Laverne was able to have contact visits with loved ones and family members at least twice a month. Mr. Sanders has never had the ability to have a contact visit with a loved one in the almost 11 years that he's been in solitary confinement. He has occasionally afforded visits, but they are visits that take place behind thick plexiglass and I think more so than having contact with other prisoners or with prison staff. It's the ability to have a contact visit with a loved one that really makes Mr. Sanders' experience in solitary confinement all that much more extreme. I'll talk a little bit now about the deprivations of due process that we think are at issue with these hearings. There's three that we'd like to highlight here. The first is that Mr. Sanders has alleged that the hearings he experiences are a sham. We think that that is enough at this stage to survive qualified immunity. If you look at the Seventh Circuit's opinion in Isby and the Sixth Circuit's opinion in Selby, both of those courts held that it was clearly established by Hewitt that it's self-evident in the requirement that you be afforded a hearing that the hearing has to be meaningful. Putting three people in a room who don't have the authority to grant your request and to come into the hearing with a preordained outcome isn't a meaningful hearing. And the Seventh Circuit in Isby and the Sixth Circuit in Selby rejected qualified immunity based solely on the allegation that the hearing that was offered was a sham. But if you look specifically at the elements of the hearings here that Mr. Sanders alleged make them a sham, it's clearly established that those amount to a due process violation as well. Mr. Sanders is never given the opportunity to argue before the actual decision maker, and that was clearly established in Hewitt. The Second Circuit in Proctor, the Seventh Circuit in Isby, and the Sixth Circuit in Selby all recognized that that was a fatal flaw with the hearings. And the third issue with due process is that the results are preordained. So Mr. Sanders has alleged that the officers who attend his hearing have already made their minds up, that the result is preordained, and that he doesn't have a meaningful opportunity to argue for his release. So at Record 572, Mr. Sanders says, the reality is that restrictive housing inmates are being held back here indefinitely. But how can he prove that? I mean, just like, just because we ask a question that you might lose, does that mean that, oh, well, we're preordained, we're not listening to the argument? No, we can ask questions that are against you, and then we ask the opponent questions against them, questions for you, questions for them, and then we make our decision. But walking in the door and having some thoughts on it is not ridiculous either. And that's even true at the district court, when you've reviewed the briefing and so forth, walking in with some thoughts and asking questions, why is that a problem? You'd be surprised, Judge Haynes, both in Isby and in Proctor, Seventh Circuit and Second Circuit, those cases had a bench trial where the officer is responsible for conducting the hearings testified, and they testified that it was either testimony or a deposition. They gave testimony that they had already made their minds up before the hearing. I think what you described is how a hearing should work. You might come in with an instinct on one side or the other, but you're open to having your mind made up. Even people who walk in saying, I've made up my mind, their mind can change. I certainly had that as a lawyer in front of judges that went, huh? And all of a sudden changed their mind, sometimes in my favor. So that's why we have arguments. I think that's fair. I think the testimony in those cases was fairly extreme. They said, yeah, there's nothing that the person could have said that would have changed my mind. But these people haven't said that. No, but I'm giving that as an example of testimony that could be adduced at summary judgment or at trial. Of course, at this stage, it's a motion to dismiss, and so we have to take as true Mr. Sanders' allegation that there's nothing that he could say or do at any of these hearings because the officers who attend them come in with a prejudged view about whether to remain him in solitary confinement. Lastly, I'll note that on the process that is afforded Mr. Sanders, the cases that the officers cite here aren't persuasive. They rely mostly on hope and strizz to unpublished opinions from this court. Hope didn't decide the issues that were presented here. Again, the question of an actual decision maker and preordained results. And strizz didn't address any of the issues that were presented here as well. On the process afforded, the key cases that clearly established that he has a right to a meaningful hearing are Hewitt and Austin, and as to Mr. Sanders' liberty interest, the key cases there are Wilkerson and Austin themselves. If the court has no further questions, we ask you to affirm. Okay. Thank you. We'll hear the rebuttal from Ms. Gorser. Thank you, Judge Haynes. May it please the court. I'd like to address a few brief issues starting with a couple of overarching premises upon which Mr. Sanders' arguments rest. The first is that Mr. Sanders provides a number of legal conclusions in his pleadings, but those are legal conclusions, not factual allegations. This court isn't required to accept Mr. Sanders' conclusions that the committee was biased against him or that the proceedings were a sham at this stage. Mr. Sanders simply hasn't provided facts to support those allegations. And in the over 250 pages of exhibits that Mr. Sanders did provide, we don't see a single fact showing that any of the decision makers were biased. And as I mentioned earlier, even if the four decision makers were all biased, there were 13 in total, and there are nine here whose conduct is unquestioned. And so, certainly, Mr. Sanders hasn't proved causation on the basis of his pleadings. Moreover, I'd like to clarify that it's Mr. Sanders' burden of proof to show that there is clearly established law, and a number of the cases that Mr. Sanders points to are out of circuit and so can't be considered for purposes of clearly established law. The next argument I'd like to address is his argument related to his cellmate's attempted escape. And Mr. Sanders' counsel alleged that Mr. Sanders hasn't had any escape-related disciplinary violations while he's been in restrictive housing. I have two responses. One that's correct, and second, I think that shows that restrictive housing works to prevent escape attempts. Moreover, the fact that he's had disciplinary violations while in restrictive housing goes to whether or not he can follow prison rules, one of which is don't escape. And so, to the extent that that is predictive of whether Mr. Sanders . . . Well, how do they decide that? I mean, I understand somebody could have maybe had a one-day, oh, I'll try to escape, and then really regretted doing that and would never do it again, and so on and so forth. Is that person going to stay in administrative segregation for the rest of their stay? And if they're in life, then for life, that seems pretty extreme. So, how does someone decide that this was just a one-day, oh, my heck, versus that's what this person's going to try to do every time they get a chance? Well, under the presumption of good faith, we would assume that the prison officials are conducting a meaningful review of the facts that are in front of them. And here, the facts include that Mr. Sanders has attempted to escape from prison at least four times. He's had a number of disciplinary violations, at least one of which was major, while he's been in restrictive housing, showing that he has difficulty following prison rules. And again, because of the presumption of good faith, we assume that the prison officials meaningfully considered all of those facts that were before the committee in determining that Mr. Sanders is still, in fact, an escape risk. What evidence would he need to try to get out? Mr. Sanders can provide any written evidence that he would like. For example, he can provide evidence that he's recently completed prison programs. If he's recently earned a GED, he can provide evidence of that to the committee as evidence of good behavior. He can also provide evidence of his lack of disciplinary infractions, although Mr. Sanders admits here that there were a number of disciplinary infractions while in restrictive housing. And so really, it comes down to whether the prison officials determine in their subjective determination that he is still an escape risk. And there is no case that Mr. Sanders has pointed to that says the committee is required to explain the evidence that they consider or provide Mr. Sanders with findings of fact. The only case we have on point, Your Honor, is Hewitt, which said only that the committee has to provide a short statement of the reasons, but not how much detail has to be included in those short statements. The next argument I'd like to address relates to his arguments, and he's reliant specifically on Isby and Proctor for his arguments related to what he calls a sham hearing. First, those cases are both out of circuit. In none of the cases that Mr. Sanders cited actually state how much detail has to be included in those statements that he has provided. And although there was testimony in both of those cases that the prison officials had made up their minds before the hearing, there is no such testimony here. In fact, Mr. Sanders hasn't even alleged a fact upon which to reach that conclusion. If the Court has no further questions, we would ask that the Court remand on the injunctive claims and reverse on the damages claims.  Thank you to both sides. This case is under consideration. We are done for today on our oral arguments, and we will be back tomorrow at 9 a.m. Thank you.